SOLVENT UNDERWRITERS SUBSCRIBING TO ENERGY INSURANCE INTERNATIONAL, INC. COVER NOTE NO. EII–3824 and Solvent Underwriters Subscribing to Energy Insurance International, Inc. Cover Note No. EII–3825, Appellants,

v.

FURMANITE AMERICA, INC., Appellee.

No. 14–07–00889–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 5, 2009.

Rehearing and Rehearing En Banc Overruled April 23, 2009.

William A. Marshall, Houston, for appellants.

Stephen W. Schueler, Melissa Prentice Lorber, William G. "Bud" Arnot, III, Houston, for appellee.

Panel consists of Chief Justice HEDGES, Justice ANDERSON, and Senior Justice PRICE.*

## OPINION

ADELE HEDGES, Chief Justice.

This summary judgment case involves an insurance-coverage dispute under a commercial general liability policy. Appellants, Solvent Underwriters Subscribing to Energy Insurance International, Inc. Cover Note No. EII–3824 ("Underwriters EII–3824") and Solvent Underwriters Subscribing to Energy Insurance

* Senior Justice FRANK C. PRICE sitting by assignment.

International, Inc. Cover Note No. EII–3825 ("Underwriters EII–3825") (collectively "Underwriters"), challenge the trial court's judgment that determined Underwriters had a duty to defend appellee, Furmanite America, Inc. ("Furmanite"), in a Louisiana toxic tort lawsuit.

In three issues, Underwriters contend that the trial court erred by: (1) denying its summary judgment motion and granting Furmanite's motion because (a) under the Operations Buyback Endorsement, the underlying claim was not made during the policy period and (b) under the Pollution Buyback Endorsement, Furmanite did not fully comply with all notice conditions required to trigger coverage; and (2) considering parol evidence to determine coverage. We affirm.

## I. BACKGROUND

Furmanite is a corporation that contracts with refineries and chemical plants to contain hazardous materials. Furmanite's core service is on-line and under pressure leak sealing, which is the process of stopping the escape of potentially hazardous liquids or gas from plant equipment while the plant remains on-line and operating.

### A. Insurance Policy in Question

In 1993, Furmanite sought comprehensive general liability insurance through its parent company, Kaneb Services, Inc. ("Kaneb"), and on August 26, 1993, Underwriters EII–3824 issued to Kaneb and its subsidiaries, which included Furmanite, a primary comprehensive general liability insurance policy ("Primary Policy"). Underwriters EII–3825 issued an excess liability insurance policy ("Excess Policy") to Furmanite as well. The parties agree that on the issues relevant to this case, the terms in the Primary and Excess policies are identical. Accordingly, the Primary Policy and Excess Policy are collectively referred to as "the Policy." The Policy states:

> "The Underwriters will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of
>
> A. bodily injury or
>
> B. property damage
>
> to which this insurance applies, caused by an occurrence and the Underwriters shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false, or fraudulent. . . ."

#### 1. Pollution Exclusion

The Policy was later amended to include an oil, seepage, and pollution exclusion. Specifically, Endorsement No. 5, titled "Third Party Oil Exclusions—'Occurrence' ("Pollution Exclusion"), provides in part:

> Notwithstanding anything to the contrary contained in this policy, it is hereby understood and agreed that this policy is subject to the following exclusions and this policy shall not apply to:
>
> . . .
>
> Liability for any bodily and/or personal injury to or illness or death of any person or loss of, damage to, or loss of use of property directly or indirectly caused by or arising out of seepage into or onto and/or pollution and/or contamination of air, land, water, and/or any other property and/or any person irrespective of the cause of the seepage and/or pollution and/or contamination, and whenever occurring.

#### 2. Operations Buyback Endorsement

The Policy is also subject to various buyback endorsements; two that are rele-

vant to this case are endorsements 7 and 8. Endorsement 7 is titled "Products Liability/Completed Operations Claims Made Endorsement" ("Operations Buyback Endorsement"). It provides in part:

> It is understood and agreed to indemnify the Assured in respect of damages arising out of the Products Liability/Completed Operations hazard, whether imposed by law or assumed under contract, in respect of any claim which is first made in writing against the Assured during the policy period and which arises solely by reason of:
>
> a) Bodily Injury/Personal Injury
>
> b) Property Damage
>
> resulting from an accident.

If Underwriters receive written notification from the Assured during the policy period and up to sixty months thereafter, of an Accident which first commences prior to the expiry of the policy period, then Underwriters will treat all claims arising out of the notified Accident made against the Assured within 60 months from the date of such notification as made on the date on which the notification was received by Underwriters of the expiry of the policy, whichever is earlier.

### 3. Pollution Buyback Endorsement

The second relevant buyback endorsement, Endorsement 8, is titled "Sudden and Accidental Seepage and Pollution Buyback Endorsement" ("Pollution Buyback Endorsement") and provides in part:

> Notwithstanding the [Pollution Exclusion] ... coverage ... will apply to ... personal injury or bodily injury or loss of, damage to or loss to use of property ... caused by seepage and pollution ... or contamination of air....

> ...
>
> Provided that ... the following conditions have been met:
>
> (a) ... the loss is accidental ...
>
> (b) the loss became known to the Assured within 7 days after its commencement ...
>
> (c) the loss was reported in writing to these Underwriters within 14 days after having become known to the Assured....

### B. Underlying Lawsuit

On July 28, 2003, Furmanite was named as a defendant in a Louisiana toxic tort lawsuit. The Louisiana suit was filed by Patrick Baughn, a former BP engineer at the Alliance Refinery in Louisiana. Baughn alleged in his petition that during his employment with BP, between 1992 and 1999, he was continually exposed to toxic airborne chemicals including benzene, hydroflouric acid, and hydrocarbons. Baughn alleged that Furmanite, while operating as a fugitive emissions contractor at the Alliance Refinery, failed to (1) "properly monitor and report fugitive emissions of toxic substances to which [Baughn] was exposed and from which injury was sustained," (2) "warn [Baughn] of the existence and occurrence of the releases of toxic substances" and "the location in the refinery where toxic releases occurred," and (3) "sound the safety alarm upon the occurrence of toxic releases."

On August 5, 2003, four days after Furmanite was served with Baughn's petition, Furmanite demanded a defense and indemnification from Underwriters in accordance with the terms of the Policy. Underwriters denied that they had the duty to defend or indemnify Furmanite.

## C. Trial Court Proceedings

After denying a duty to defend, Underwriters filed this action, seeking a declaration that the Policy did not insure Furmanite against their potential liability in the *Baughn* lawsuit and therefore owed no duty to defend or indemnify Furmanite. Furmanite answered with counterclaims alleging breach of contract and violations under article 21.21 of the Texas Insurance Code. Furmanite also sought a declaration from the trial court that some or all of the claims asserted in the *Baughn* lawsuit were covered under the Policy.

Underwriters moved for summary judgment asserting that there was no coverage under the Policy giving rise to a duty to defend or indemnify. Furmanite responded with a partial summary judgment motion, urging the trial court to dismiss Underwriters' request for a declaratory judgment. Relying on the Pollution and Operations buyback endorsements, Furmanite argued that the Policy provided coverage, thereby requiring Underwriters to defend and indemnify Furmanite in the *Baughn* lawsuit. On September 7, 2006, the trial court denied Underwriters' motion for summary judgment, granted Furmanite's partial summary judgment motion, and declared that Furmanite was entitled to a defense in the *Baughn* lawsuit.

Furmanite then sought a second summary judgment on its counterclaim for breach of contract and attorney's fees. On June 29, 2007, the trial court granted Furmanite's subsequent motion for summary judgment and awarded Furmanite attorney's fees. On September 13, 2007, the trial court reformed the judgment to reflect the appropriate allocation of attorney's fees based on the subscribed percentages of those assuming the risk in the Policy.

On appeal, appellant argues that the trial court erred in: (1) denying its summary judgment motion and granting Furmanite's motion because (a) under the Operations Buyback Endorsement, the underlying claim was not made during the policy period and (b) under the Pollution Buyback Endorsement, Furmanite did not fully comply with all notice conditions required to trigger coverage; and (2) improperly considering parol evidence to determine coverage.

## II. STANDARD OF REVIEW

Declaratory judgments decided by summary judgment are reviewed under the same standards of review that govern summary judgments generally. Tex. Civ. Prac. & Rem.Code § 37.010; *Lidawi v. Progressive County Mut. Ins. Co.*, 112 S.W.3d 725, 730 (Tex.App.-Houston [14th Dist.] 2003, no pet.). We review a summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). Traditional summary judgment is proper only when the movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). In reviewing a summary judgment, we must indulge every reasonable inference in favor of the nonmovant, take all evidence favorable to the nonmovant as true, and resolve any doubts in its favor. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995). When, as here, a summary judgment does not specify the grounds on which it was granted, we will affirm the judgment if any one of the theories advanced in the motion is meritorious. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex.2004).

## III. DUTY TO DEFEND AND INDEMNIFY

Underwriters' first two issues challenge coverage and the duty to defend

or indemnify Furmanite in the *Baughn* lawsuit. Whether an insurance carrier owes a duty to defend under an insurance policy is a question of law which the appellate court reviews *de novo*. *Koenig v. First Am. Title Ins. Co. of Tex.*, 209 S.W.3d 870, 873 (Tex.App.-Houston [14th Dist.] 2006, no pet.). If a petition does not allege facts within the scope of coverage, an insurer is not legally obligated to defend a suit against its insured. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997). Thus, the duty to defend is determined by the allegations in the underlying pleadings and the language of the insurance policy. *Id.* This standard is referred to as the "eight corners" rule or the "complaint-allegation" rule. *See King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex.2002). Under the eight corners rule, a liability insurer is obligated to defend the insured if the facts alleged in the pleadings would give rise to any claim within the coverage of the policy based on the policy terms. *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 201 (Tex.2004). We interpret the allegations liberally in favor of the insured. *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268, S.W.3d 487, 491 (Tex.2008). Any doubt as to whether the insurer has the duty to defend is resolved in favor of such duty. *King*, 85 S.W.3d at 187.

The duty to defend is distinct from, and broader than, the duty to indemnify. *Zurich*, 268 S.W.3d at 490 (quoting 14 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 200:1 (3d ed.2007)). An insurer must defend its insured if a plaintiff's factual allegations potentially support a covered claim, while the facts actually established in the underlying suit determine whether the insurer must indemnify its insured. *See GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex.2006). Unlike the duty to indemnify, whether there is a duty to defend does not depend on the actual facts which might support liability in the underlying suit. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821–22 (Tex. 1997). An insurer may have a duty to defend but, eventually, no obligation to indemnify. *Zurich*, 268 S.W.3d at 490–91.

## A. Construing the Pleadings in the Underlying Suit

We look first at the facts alleged in the *Baughn* petition. Baughn alleged that during his employment with BP, between 1992 and 1999, he was continually exposed to toxic airborne chemicals including benzene, hydroflouric acid, and hydrocarbons. Baughn specifically alleged that Furmanite, while operating as a fugitive emissions contractor at the Alliance Refinery, failed to (1) "properly monitor and report fugitive emissions of toxic substances to which [Baughn] was exposed and from which injury was sustained," (2) "warn [Baughn] of the existence and occurrence of the releases of toxic substances" and "the location in the refinery where toxic releases occurred," and (3) "sound the safety alarm upon the occurrence of toxic releases."

## B. Construing the CGL Policy Terms

We look next to the policy language at issue in this case. The Policy initially covers damages resulting from "bodily injury ... caused by an occurrence." An occurrence is defined in the Policy as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage...." The Pollution Exclusion, however, eliminates "liability for any bodily ... or personal injury ... arising out of seepage into or ... pollution ... or contamination of air...."

Thus, there is no coverage under the Policy for Baughn's claim based on the Pollution Exclusion except to the extent that coverage is restored by the Pollution or Operations buyback endorsements. Accordingly, we need to construe only these two buyback endorsements and determine whether the terms of either endorsement provides coverage for the injuries asserted in the *Baughn* lawsuit.

### C. Construing and Applying the Operations Buyback Endorsement With the Pleadings

The Operations Buyback Endorsement provides in part that Furmanite will be indemnified for "damages arising out of the Products/Liability/Completed Operations hazard ... of any claim ... first made in writing against the Assured during the policy period ... arising ... by reason of bodily injury ... [or] property damage...." The endorsement further requires Furmanite to notify Underwriters of the claim within 60 months after the covered accident commences. Pursuant to the eight corners rule, we compare the factual allegations in Baughn's petition with the language of the Operations Buyback Endorsement to determine coverage. *See Utica Nat'l*, 141 S.W.3d at 201.

■ Underwriters argue that there is no coverage under this particular endorsement because Baughn's claim was not first made in writing during the policy period. We agree. The plain language of the Operations Buyback Endorsement limits liability to those claims made during the policy period. The policy period was August 1993 through August 1994. Because Baughn first made his claim outside of the policy period, in 2003, no coverage exists under this particular endorsement.

Furmanite argues that the Policy does not require a claim to be made during the policy period; it claims instead that it is the occurrence of the physical injury rather than the making of the claim that must take place during the policy period. According to Furmanite, the Policy should be interpreted as an occurrence-based policy, thus requiring that Baughn's physical injury, not his claim, occur during the policy period. Construing the Policy as an occurrence-based policy, Furmanite contends that the claim is covered because Baughn's petition alleges an injury between 1992 and 1999, a span of years that encompasses the policy period. Because the Operations Buyback Endorsement cannot be construed as an occurrence-based provision, we reject this argument.

■ Typically, an occurrence-based policy covers all claims based on an event occurring during the policy period, regardless of whether the claim or occurrence is brought to the attention of the insured or made known to the insurer during the policy period. *See Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 844 n. 4 (Tex.1994); *Pilgrim Enters., Inc. v. Maryland Cas. Co.*, 24 S.W.3d 488, 496 (Tex. App.-Houston [1st Dist.] 2000, no pet.). In contrast, a claims-made policy covers only claims made during the policy period for injuries or occurrences within a coverage period. *Garcia*, 876 S.W.2d at 844 n. 3; *Pilgrim*, 24 S.W.3d at 496.

While Furmanite is correct that many provisions in the Policy are occurrence-based, generally linking coverage to an occurrence or accident, these occurrence-based provisions would not provide coverage in the instant case. Coverage does not exist in this case except to the extent that the Operations or Pollution buyback Endorsements restore coverage. Reviewing first the Operations Buyback Endorsement, it is clearly a claims-made provision. Specifically, this particular endorsement states that there is coverage "of *any claim* ... first *made in writing* against the As-

sured *during the policy period ....*" Furmanite's contention that the claim need not be made during the policy period contradicts the plain language of this buyback endorsement and therefore lacks merit.

The Operations Buyback Endorsement limits coverage to those claims made between August 1993 and August 1994. Baughn's petition reflects that his claim was made in 2003. Applying the eight corners rule, the Operations Buyback Endorsement does not cover the injury asserted in Baughn's petition. Thus, the Operations Buyback Endorsement does not impose a duty to defend or indemnify Furmanite in the underlying lawsuit. We now look to the Pollution Buyback Endorsement for coverage.

### D. Construing and Applying the Pollution Buyback Endorsement With the Pleadings

The Pollution Buyback Endorsement provides in part:

coverage ... will apply to personal injury or bodily injury or loss of, damage to or loss to use of property ... caused by seepage and pollution ... or contamination of air....

. . .

Provided that ... the following conditions have been met:

"(a) ... the loss is accidental ...

(b) the loss became known to the Assured within 7 days after its commencement ...

(c) the loss was reported in writing to these Underwriters within 14 days after having become known to the Assured...."

There are two parts to the Pollution Buyback Endorsement. The first part identifies what type of claims are potentially covered, claims rising from: (1) a personal injury; (2) a bodily injury; or (3) a loss of, damage to or loss to use of property. It is undisputed that Baughn's claim is one for personal or bodily injury.

The second part of this endorsement attaches an additional limit to liability for a "loss." Liability for a "loss" must be one that is: (1) accidental; (2) became known to the insured within seven days after its commencement; and (3) reported in writing to Underwriters within 14 days after the insured became aware of such "loss." Underwriters argue that Furmanite did not become aware of Baughn's claim within seven days after its commencement. Thus, Underwriters contend, coverage has not been triggered under the Pollution Buyback Endorsement.

 To determine coverage under the Pollution Buyback Endorsement, we must determine the meaning of "loss," and whether Baughn's injury constitutes a "loss" for purposes of the Pollution Buyback Endorsement. In determining the meaning of "loss," we apply the ordinary rules of contract construction. *See Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex.1998); *Williams Consol. I, Ltd./BSI Holdings, Inc. v. TIG Ins. Co.,* 230 S.W.3d 895, 901–02 (Tex. App.-Houston [14th Dist.] 2007, no pet.). In applying these rules, our primary concern is to ascertain the parties' intent as expressed in the language of the policy. *Williams,* 230 S.W.3d at 902. In determining the intention of the parties, we look only within the four corners of the insurance agreement to see what is actually stated, not what was allegedly meant. *See Esquivel v. Murray Guard, Inc.,* 992 S.W.2d 536, 544 (Tex.App.-Houston [14th Dist.] 1999, pet. denied).

 Although the term "loss" is not defined in the Policy, its meaning can be interpreted from a review of the entire

policy. *See Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736–37 (Tex.1990). The term "loss" is used in conjunction with the phrase "loss of, damage to, or loss of use of property" throughout the Policy's exclusions and buyback endorsements. The Pollution Exclusion is one of the many provisions relating "loss" to property damage. Because the Pollution Buyback Endorsement partially restores coverage for injuries excluded under the Pollution Exclusion, we read the two provisions together. *See Provident Life and Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex.2003). The Pollution Exclusion explains that "[t]he words 'loss of, damage to, or loss of use of property' ... include ... loss of, damage to or loss of property directly or indirectly resulting from subsurface operations of the Assured." The Pollution Exclusion does not use the term "loss" to describe physical or bodily injury, only property damage. *See Gonzalez*, 795 S.W.2d at 736 ("Words used in one sense in one part of a contract are, as a general rule, deemed to have been used in the same sense in another part of the instrument, where there is nothing in the context to indicate otherwise"). The use of "loss" is linked consistently with property damage, and Underwriters have cited to nothing in the Policy that purports to characterize a "loss" other than for property damage. The need for a stringent notice requirement for property damage is understandable: injury to property is immediately apparent, and an insurance company would need to quickly inspect the property. Bodily injury, however, is frequently not as apparent as property damage, and, as in the *Baughn* case, often manifests itself much later.

While it is important to recognize that the ordinary meaning of "loss" could be understood to include bodily injury, our primary task in interpreting a "loss" under the Pollution Buyback Endorsement is "to ascertain the parties' intent *as expressed in the language in the policy.*" *Williams*, 230 S.W.3d at 902 (emphasis added). In determining the intention of the parties, "we look *only* within the four corners of the insurance agreement to see *what is actually stated*, not what was allegedly meant." *See id.* (emphasis added); *see also Esquivel*, 992 S.W.2d at 544.

▮ Underwrites urge this Court to use the term "occurrence," which is defined in the Policy to include bodily injury, in place of "loss." Underwriters insist that "occurrence" was the agreed-upon term for the endorsement. To substitute these words, terms with different meanings from one another, would require us to rewrite the Policy, which we cannot do. *See Tenneco, Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex.1996); *Carlton v. Trinity Universal Ins. Co.*, 32 S.W.3d 454, 465 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (holding that an appellate court cannot rewrite the policy or revise its provisions to avert what the parties perceive to be unfavorable consequences that might flow from the court's interpretation and construction). Additionally, to determine which word was agreed upon by the parties, we would have to look to extrinsic evidence. However, because there is no ambiguity, we cannot look to evidence outside the Policy. *See Lone Star Heat Treating Co., Ltd. v. Liberty Mut. Fire Ins. Co.*, 233 S.W.3d 524, 527 (Tex.App.-Houston [14th Dist.] 2007, no pet.). We decline Underwriters' invitation to substitute "occurrence" for "loss."

In the alternative, Underwriters argue that "loss" should be interpreted to mean "bodily injury caused by seepage, pollution and contamination." We acknowledge that the ordinary meaning of "loss" could be understood to include "bodily injury caused by seepage, pollution and contami-

nation." However, the Policy does not so state, and we are required to construe "loss" as expressed in the language in the Policy. *See Williams,* 230 S.W.3d at 902. We look only within the four corners of the insurance agreement to see what is actually stated, not what Underwriters claim was allegedly intended or agreed to by the parties. *See id.; see also Esquivel,* 992 S.W.2d at 544. Here, the use of the term "loss" is linked consistently with property damage. Furthermore, the Policy does not use the term "loss" to describe physical or bodily injury, only property damage. *See Gonzalez,* 795 S.W.2d at 736 ("Words used in one sense in one part of a contract are, as a general rule, deemed to have been used in the same sense in another part of the instrument, where there is nothing in the context to indicate otherwise"). We find nothing in the Policy that purports to characterize a "loss" other than for property damage.[1]

Applying the appropriate interpretation and construction rules, we interpret "loss" in the Pollution Buyback Endorsement to mean "loss of, damage to, or loss of use of property." Therefore, the additional notice requirements in the second part of the endorsement—that the loss became known to the insured within seven days after its commencement and reported in writing to Underwriters within 14 days thereafter—have no bearing on claims arising from personal or bodily injury. Because Baughn alleges a personal or bodily injury, not a loss of, damage of, or loss of use of property, the notice conditions attached to a claim for a "loss" are not applicable to Baughn's claim. Accordingly, Baughn's

petition alleges a claim covered under the Pollution Buyback Endorsement.[2] We overrule issues one and two.

We also note that Underwriters did not raise the issue of whether they were prejudiced by untimely notice, if any, under the State Board of Insurance's mandatory endorsement articulated in Board Order 23080. *See PAJ, Inc. v. Hanover Ins. Co.,* 243 S.W.3d 630, 632–33 (Tex.2008). In issuing Board Order 23080, the State Board of Insurance required a mandatory endorsement to all CGL policies that precludes forfeiture of coverage for an insured's failure to comply with notice or forwarding conditions unless the insurer is prejudiced. *Id.* at 632. Because the additional notice requirements for a "loss" in the Pollution Buyback Endorsement have no bearing on coverage for Baughn's injury, Furmanite is subject only to the Policy's general notice requirement, which provides: "[i]n the event of an occurrence, written notice ... shall be given by ... the Insured to the Insurer(s)'s ... representative as soon as practicable." There is no contention by Underwriters that Furmanite did not fulfill this general notice requirement. Therefore, the issue for lack of proper notice is not relevant.

## PAROL EVIDENCE

In their third issue, Underwriters argue that the trial court erroneously considered extrinsic evidence in determining coverage. Although affidavits were attached as summary judgment evidence, Underwriters have not demonstrated with citations to the record that the trial court considered

---

1. Additionally, Furmanite argues that "loss" should be interpreted to mean the filing of Baughn's claim. There is nothing in the record to support this interpretation of "loss."

2. We do not reach the issue of Underwriters' duty to indemnify because there is nothing in

our record reflecting that liability has been determined in the Louisiana lawsuit. *See GuideOne Elite,* 197 S.W.3d at 310 (reasoning that the facts actually establishing liability in the underlying suit determine whether the insurer must indemnify its insured).

parol evidence, and nothing in the record supports this contention. *See Hayes v. Wells Fargo Bank, N.A.,* No. 01–06–00720–CV, 2007 WL 3038043, at *4 (Tex. App.-Houston [1st Dist.] Oct. 18, 2007, pet. denied) (mem.op.). In fact, Underwriters state in their opening brief that they merely "presume that the trial court considered ... parol evidence." We overrule the third issue.

We affirm the trial court's judgment.