**Reversed and Remanded and Memorandum Opinion filed September 25, 2012.**



In The

# Fourteenth Court of Appeals

———————————

## NO. 14-11-00539-CV

———————————

### NORTHERN NATURAL GAS COMPANY, Appellant

### V.

### ONEOK BUSHTON PROCESSING, INC., ONEOK FIELD SERVICES COMPANY, LLC, AND ONEOK, INC., Appellees

**On Appeal from the 189th District Court
Harris County, Texas
Trial Court Cause No. 2009-52251**

## MEMORANDUM OPINION

In six issues, Northern Natural Gas Company ("Northern") appeals the trial court's final summary judgment in favor of ONEOK Bushton Processing, Inc. ("OBP"), ONEOK Field Services Company, LLC ("OFS"), and ONEOK, Inc. ("OI") (collectively, the "ONEOK Entities") and denial of Northern's cross-motion for summary judgment. We reverse and remand.

# I. BACKGROUND[1]

In March 1997, Enron-related entities affiliated with Northern sold to entities related to KN Energy, Inc. ("KNE") a natural gas processing complex (the "Bushton Complex") and certain natural gas gathering systems which delivered gas to an interstate pipeline system owned by Northern. KN Gas Gathering, Inc. ("KNGG") acquired interests in upstream gathering systems connected to Northern's pipeline. Northern's pipeline then delivered the gas to the Bushton Complex, which was acquired by KN Processing, Inc. ("KNPI").

The natural gas flowing through the various pipelines contains drip liquids, condensate, water, and sediment ("Liquids"). Liquids are collected at various locations throughout the gathering systems and pipeline system. Additionally, Liquids are also separated at compression sites along Northern's pipeline and collected in tanks. As discussed in depth below, these Liquids are the subject of provisions in an operating agreement (the "Operating Agreement") entered into by Northern, KNPI, KNGG, and KNE, and an access and service agreement (the "Access Agreement") between Northern and KNGG.[2] Notably, under the Operating Agreement, Northern had the option to terminate the agreement if natural gas was not processed at the Bushton Complex for twelve consecutive months.

Subsequently, OBP became the successor-in-interest of KNPI, OFS became the successor-in-interest of KNGG, and OI became the successor-in-interest of KNE. A dispute arose between Northern and the ONEOK Entities regarding ownership of the downstream Liquids.[3] Northern desired to terminate the Operating Agreement, contending that natural gas had not been processed at the Bushton Complex for more than

---

[1] Apparently, the parties do not dispute the background facts described in this section.

[2] When referring collectively to the Operating and Access Agreements, we will use the term the "Agreements." Further, when referring collectively to all parties to the Agreements, we will use the term "Contracting Parties."

[3] We explain the meaning of "downstream Liquids" below in the section entitled "D. Analysis."

twelve consecutive months. According to Northern, termination of the Operating Agreement would vest ownership of the downstream Liquids in Northern. Contrarily, the ONEOK Entities argue that, even if the Operating Agreement were terminated, OFS, as successor to KNGG, would still own the downstream Liquids pursuant to the Access Agreement.

In 2009, Northern filed suit against the ONEOK Entities, seeking a declaration that OFS does not have any ownership interest in the downstream Liquids. The ONEOK Entities filed a counterclaim, seeking a declaration that OFS has an ownership interest in the downstream Liquids. The parties filed cross-motions for summary judgment. The trial court granted the ONEOK Entities' motion and denied Northern's motion, implicitly determining the Agreements unambiguously support the conclusion KNGG (and its successor, OFS) has an ownership interest in the downstream Liquids.

## II. SUMMARY JUDGMENT

In six related issues, Northern contends the trial court erred by granting summary judgment in favor of the ONEOK Entities and denying Northern's motion for summary judgment. Succinctly, Northern argues the Agreements are unambiguous and establish as a matter of law that KNPI owns the downstream Liquids, and KNGG merely has a possessory interest in such Liquids.

### A. Standard of Review

We review declaratory judgments rendered in summary-judgment proceedings under the same standards that govern summary judgments generally. *Philipello v. Nelson Family Farming Trust*, 349 S.W.3d 692, 693 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). A party moving for traditional summary judgment must establish there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). If the movant establishes a right to summary judgment, the burden shifts to

3

the non-movant to present evidence raising a material fact issue. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

We review a summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). In reviewing the trial court's rulings on cross-motions for summary judgment, we must consider all summary-judgment evidence, determine all issues presented, and render the judgment the trial court should have rendered. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). We may consider evidence presented by both parties in determining whether to grant either motion. *Expro Americas, LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 919 (Tex. App.—Houston [14th Dist.] 2011, pet. filed).

## B. Standards of Contract Construction

In construing a contract, we must ascertain the true intentions of the parties as expressed in the writing. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We should afford common words their plain meaning unless context indicates the words are used in another sense. *Lesikar v. Moon*, 237 S.W.3d 361, 367 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). We must consider the entire writing in an effort to harmonize and give effect to all provisions so that none are rendered meaningless. *Id.* A contract is not ambiguous if it is so worded that it can be given a definite or certain legal meaning. *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 728 (Tex. 2001). Conversely, a contract is ambiguous when its meaning is uncertain and doubtful or reasonably susceptible to more than one interpretation. *White Oak Operating Co., LLC v. BLR Const. Comps., LLC*, 362 S.W.3d 725, 733 (Tex. App.—Houston [14th Dist.] 2011, no pet.). However, an ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Sturges*, 52 S.W.3d at 728. Rather, for an ambiguity to exist, both interpretations must be reasonable. *Id.* Further, the issue of contractual ambiguity may be considered *sua sponte* by a reviewing court. *See*

*Progressive Cnty. Mut. Ins. Co. v. Kelley*, 284 S.W.3d 805, 808 (Tex. 2009).   We should not strain to find an ambiguity in a contract if, in doing so, we defeat the probable intentions of the parties.   *Comunidad Balboa, LLC v. City of Nassau Bay*, 352 S.W.3d 72, 76 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

Documents pertaining to the same transaction may be read together, even if they are executed at different times and do not reference each other, and courts may construe all the documents as if they were part of a single, unified instrument.   *In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010) (orig. proceeding) (per curiam).   When parties execute multiple written agreements to complete a transaction, we attempt to find harmony between and within the agreements in determining the parties' intent.   *Comunidad Balboa*, 352 S.W.3d at 76.

## C.   Operating and Access Agreements

On March 31, 1997, Northern and KNPI, KNGG, and KNE (the "Operating Parties") entered into the Operating Agreement.   In the Operating Agreement, Northern's interstate pipeline is referred to as the "Northern System," and "Condensate and Drip Liquids" is defined as "liquid hydrocarbons recovered at the surface without resorting to processing."   Importantly, Section 3.7 of the Operating Agreement provides as follows:

> Condensate and Drip Liquids.   All Condensate and Drip Liquids removed from any of the pipelines, equipment or facilities comprising the Northern System downstream of the custody transfer points in Kansas, Oklahoma, and the Texas panhandle **will belong to** KNPI and the Bushton Complex, and KNPI **shall have title to** such Condensate and Drip Liquids and the right to use, market or dispose of the same and to retain all revenues attributable to such Condensate and Drip Liquids; provided that KNPI shall be responsible for: i) the detailed accounting of such liquids and the BTUs they represent; ii) picking-up, hauling or paying any costs for such Condensate, Drip Liquids as well as associated basic sediment and water; iii) reimbursing Northern in the amount of Six Hundred Forty Thousand Dollars ($640,000.00) annually for Northern's related capital and O&M costs; and iv) for the shrinkage attributable to such Condensate and Drip Liquids.   KNPI shall also be

5

responsible for the liability and cost associated with the disposal of the pipeline drip and condensate.

(emphasis added).

Also on March 31, 1997, Northern and KNGG (the "Access Parties") entered into the Access Agreement. In the Access Agreement, (1) "Gathering System" means "Hugoton gathering systems in southwest Kansas and the panhandle of Oklahoma" which KNGG was acquiring and (2) "Transmission System" means Northern's natural gas transmission systems (i.e., pipeline) and appurtenant facilities. The Access Parties recognized that "at each location where the Gathering System connects to the Transmission System, the transfer of custody of a flowing gas stream will occur." The Access Parties also acknowledged that Northern owns certain liquid-storage facilities ("Facilities") along the Transmission System and "[t]itle to and ownership of the Facilities shall remain vested in Northern."

KNGG agreed to provide various services related to Northern's Transmission System and Facilities, including certain environmental, emergency, and repair and maintenance services. Significantly, in section 1.2(a) of the Access Agreement, KNGG agreed to provide the following service:

> Operation Services. KNGG, as often as Northern deems reasonably necessary, or with such frequency as will prevent the overflow of the Facilities, shall collect or cause to be collected all condensate, drip and BS&W (Liquid(s)) **belonging to KNGG** pursuant to Section 2.6 below, from the Facilities and **shall dispose of such** away from the Transmission System.

(emphasis added). Under Section 2.6, "All Liquids collected in the Facilities **shall belong to KNGG**." (emphasis added). In order to provide these services, Northern agreed that KNGG shall have limited access to the Facilities. Further, "At those locations where liquids are transferred from Facilities to KNGG or on KNGG's behalf, KNGG agrees to establish operating practices that will minimize the potential for adverse environmental consequences."

6

## D. Analysis

We first consider the Operating and Access Agreements separately. The Access Agreement reasonably may be interpreted to vest ownership of the downstream Liquids in KNGG, and the Operating Agreement reasonably may be interpreted to vest ownership of the downstream Liquids in KNPI.

In the Access Agreement, the Access Parties agreed that the Liquids "belong to" KNGG, and KNGG shall dispose of the Liquids away from Northern's Transmission System. The "belonging to" and "belong to" language in sections 1.2(a) and 2.6 of the Access Agreement plausibly suggests ownership. *See Wells v. Ward*, 207 S.W.2d 698, 699 (Tex. Civ. App.—Texarkana 1947, writ ref'd n.r.e.) (explaining the words "belong to" are "synonymous with or mean the same as 'to be the property of.' They connote title or ownership."); *see also Investors Syndicate Credit Corp. v. Ates*, 420 S.W.2d 444, 445 (Tex. Civ. App.—Tyler 1967, no writ) (same); *cf. Tenneco Oil Co. v. Alvord*, 416 S.W.2d 385, 388–89 (Tex. 1967) (concluding contract provision was unambiguous regarding ownership because it provided "all present and future production" from specified wells "shall belong to" owner of leases "so long as said wells continue to produce from the horizon from which said wells are presently producing and until" wells are abandoned; "[t]he parties could agree that a well belonged to one of them and that minerals produced from that hole would belong to the owner thereof without that person owning all of the minerals in the land down to the depth of that well."). Nothing in the Access Agreement suggests that KNGG is required to collect and transport the Liquids away from the Transmission System but then maintain and store the Liquids until Northern—as continuing owner of the Liquids—decides how to dispose of them.[4] Accordingly, construing the Access

---

[4] Northern contends that, under the Access Agreement, KNGG does not have ownership rights to the Liquids because Northern decides when KNGG collects such Liquids. However, section 1.2(a) of the Access Agreement provides, "KNGG, as often as Northern deems reasonably necessary, *or with such frequency as will prevent the overflow of the Facilities*," shall collect Liquids belonging to KNGG." (emphasis added). Hence, Northern may request collections, but KNGG's obligation to collect the Liquids is not dependent upon such requests.

Agreement by the plain meaning of its terms, it is reasonable to conclude KNGG owns, and determines how and when to dispose of, the Liquids. *See Lesikar*, 237 S.W.3d at 367.

Northern argues the term "Liquids" as used in the Access Agreement refers to *all Liquids*, both upstream (which Northern does not own) and downstream (which Northern owns) of custody transfer points. Thus, according to Northern, "belong to," as used in the Access Agreement, does not mean a grant of ownership because Northern could not have conveyed upstream Liquids it does not own. Northern attempts to bolster this argument by contending that, in the Operating Agreement, KNPI is conveyed title to only Liquids removed "downstream of the custody transfer points" (which Northern owns and has the right to convey). However, the ONEOK Entities presented some evidence supporting a finding that *KNGG* owned the upstream Liquids.[5] Thus, the Access Agreement reasonably may be interpreted to mean that the Access Parties included the downstream Liquids owned by Northern *in the same category* as the upstream Liquids owned by KNGG when describing Liquids which "belong to" KNGG. Such an interpretation supports a conclusion that Northern conveyed its downstream Liquids to KNGG.

Contrarily, the Operating Agreement construed in isolation reasonably may be interpreted to support a conclusion that KNPI is the sole owner of downstream Liquids. The Operating Parties agreed that downstream Liquids "belong to KNPI and the Bushton Complex, and KNPI shall have title to such Condensate and Drip Liquids and the right to use, market or dispose of the same and to retain all revenues attributable to such Condensate and Drip Liquids." The Operating Parties further agreed that KNPI has the following responsibilities related to the downstream Liquids: 1) "detailed accounting of such liquids and the BTUs they represent"; 2) "picking-up, hauling or paying any costs for such" Liquids and basic sediment and water; 3) reimbursing Northern $640,000 annually "for Northern's related capital and O&M costs"; 4) "shrinkage attributable to such"

---

[5] Additionally, in its appellate briefing, Northern asserts, "[t]he parties agree KNGG, by virtue of its ownership of the gathering system, and not the Access Agreement, owned the upstream liquids."

8

Liquids; and 5) "liability and cost associated with the disposal of the pipeline drip and condensate." Nothing in the Operating Agreement suggests that KNGG shares ownership of the downstream Liquids with KNPI.

Standing alone, circumstances giving rise to reasonable interpretations of two contracts pointing to different owners of the same downstream Liquids casts doubt on the propriety of summary judgment in this case. This doubt is not resolved when we analyze the Contracting Parties' intent by attempting to construe the Agreements together, as the parties invite us to do.[6]

First, we note that, in the Operating Agreement, KNPI's rights regarding the downstream Liquids were described in more specific terms than were KNGG's rights regarding the Liquids in the Access Agreement. "[S]pecific and exact terms are given greater weight than general language." *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center East, Inc.*, 290 S.W.3d 554 560–61 (Tex. App.—Dallas 2009, no pet.). Moreover, it appears KNPI agreed to provide consideration for the downstream Liquids, notably, responsibility for shrinkage[7] related to the Liquids and $640,000 annually to Northern for related costs. The Access Parties did not use specific language to describe KNGG's rights relative to the Liquids. Moreover, the Access Agreement does not contain

---

[6] We recognize Northern and KNGG were parties to the Access Agreement whereas Northern, KNGG, *and* KNPI and KNE were parties to the Operating Agreement. Despite this difference, we construe the Agreements together because Northern and KNGG were parties to both Agreements and both Agreements involve the same subject matter—disposition of the downstream Liquids. *See* Williston on Contracts § 30:26 (noting written instruments pertaining to the same subject matter may be considered together "even when the parties to the instruments are not the same, as long as the writings form part of a single transaction and are designed to effectuate the same purpose" (citations omitted)). The parties contend that the Agreements should be construed together, and we agree.

[7] "Shrinkage" as used in the natural gas industry is defined as "The reduction in volume of wet natural gas due to the extraction of some of its constituents, such as hydrocarbon products, hydrogen sulphide, carbon dioxide, nitrogen, helium, and water vapor." http://www.aga.org/Kc/glossary/Pages/s.aspx. (American Gas Association's online glossary) (last visited September 2012). Northern argues KNPI is required to reimburse Northern in money for any shrinkage caused by removal of the downstream Liquids, and Northern uses such money to purchase additional gas for its suppliers. However, KNPI's responsibilities regarding shrinkage are not specified in the Operating Agreement.

9

express terms whereby KNGG is required to provide consideration in exchange for ownership of the Liquids. Northern argues that, under the doctrine of *inclusio unius est exclusio alterius*, we should presume the Contracting Parties' inclusion of specific ownership language in the Operating Agreement means they intended to exclude such language from the Access Agreement. *See City of Houston v. Williams*, 353 S.W.3d 128, 145 (Tex. 2011) ("[T]he doctrine of *inclusio unius* . . . is the presumption that purposeful inclusion of specific terms in a writing implies the purposeful exclusion of terms that do not appear."). We agree that inclusion of more specific ownership language in the Operating Agreement weighs in favor of Northern's interpretation of the Agreements.

What then are KNGG's rights regarding the downstream Liquids? Did the Contracting Parties intend KNGG would act as custodian, collecting downstream Liquids from Northern's Facilities, then transfering custody of such Liquids to KNPI? Northern argues this interpretation is supported by a case in which the Supreme Court of Virginia concluded the term "belonging to" as used in the Virginia Constitution meant "exclusive right to its possession," not ownership. *Bd. of Supervisors of Wythe County. v. Med. Grp. Found., Inc.*, 134 S.E.2d 258, 261–62 (Va. 1964).[8] Northern also argues that the provision "Title to and ownership of the Facilities shall remain vested in Northern" in the Access Agreement proves the Access Parties considered "record title" and "beneficial ownership" to be separate concepts.[9] According to Northern, it is clear the Contracting Parties

---

[8] Northern also cites several cases that involve the differences between possession to property and title of property, including bailment cases and criminal cases involving theft. It is unnecessary to our disposition to discuss these cases.

[9] Northern cites a 1906 case in which the United States Supreme Court discussed the difference between "record title" and "beneficial ownership":

> The expression 'beneficial use' or 'beneficial ownership or interest' in property is quite frequent in the law, and means, in this connection, such a right to its enjoyment as exists where the legal title is in one person and the right to such beneficial use or interest is in another, and where such right is recognized by law, and can be enforced by the courts, at the suit of such [beneficial] owner or of some one in his behalf.

*Mont. Catholic Missions v. Missoula Cnty.*, 200 U.S. 118, 127–28 (1906); *see also McAlister v. Eclipse Oil Co.*, 98 S.W.2d 171, 176 (Tex. 1936) (explaining stockholders are beneficial owners and do not have legal

10

intended KNPI to be the sole owner of the downstream Liquids because, in section 3.7 of the Operating Agreement, KNPI is granted both record title and the rights of a beneficial owner to such Liquids, whereas the Access Parties mention neither "title" nor "ownership" but merely "belong to" when describing KNGG's rights to the Liquids in the Access Agreement. Thus, according to Northern, "belong to" is not synonymous with "ownership," particularly because KNGG's "ownership" of other items is expressly referenced in the Access Agreement.[10] For these reasons, Northern argues the Contracting Parties would have used the terms "own" or "title" instead of "belong to" had they intended for KNGG to have any ownership interest in the Liquids.

Northern also argues the meaning of the term "belong to" as used in section 3.7 of the Operating Agreement supports its contention that the term "belong to" does not connote ownership as used in section 1.2(a) of the Access Agreement. *See Solvent Underwriters v. Furmanite Am., Inc.*, 282 S.W.3d 661, 670 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) ("Words used in one sense in one part of a contract are, as a general rule, deemed to have been used in the same sense in another part of the instrument, where there is nothing in the context to indicate otherwise." (citation omitted)). In section 3.7, the Operating Parties agreed downstream Liquids "will *belong to* KNPI and the Bushton Complex, and KNPI shall have title to such [Liquids] and the right to use, market or dispose of the same and to retain all revenues attributable to such [Liquids]." (emphasis added). Northern argues "belong to" as used in this sentence does not refer to ownership because KNPI's title and ownership rights regarding the downstream Liquids are separately delineated by other language in the same sentence. Further, the Bushton Complex is not a legal entity but a gas processing plant incapable of owning or holding title

_____

title of corporate property).

[10] Specifically, in section 1.5(d) of the Access Agreement, KNGG is "responsible for maintaining cathodic protection levels . . . on all facilities *owned by KNGG* that are located on Northern's property," and in section 1.9, "*Ownership* of any new personal property added by KNGG shall be the property of KNGG." (emphasis added).

11

to the Liquids. Northern also argues that "belong to" must mean "possession" because gas is possessed and then processed at the Bushton Complex. Therefore, Northern contends the Liquids "belong to" KNGG under the Access Agreement simply for purposes of KNGG's accessing the Facilities to possess the Liquids. Northern argues this interpretation is further supported by the fact that section 2.6 of the Access Agreement specifies Liquids "collected in" the Facilities belong to KNGG, whereas section 3.7 of the Operating Agreement specifies KNPI has title to and ownership of downstream Liquids "removed from" the Facilities; Northern posits that "collected in" means "while physically in the Facilities" and "removed from" means "after being physically removed from the Facilities."

We do not necessarily disagree with Northern's contention that the Agreements may be reasonably interpreted to mean the Contracting Parties intended KNPI to be the sole owner of the Liquids. However, to be entitled to summary judgment, Northern must conclusively prove the Agreements do not support a reasonable interpretation that KNGG has an ownership interest in the downstream Liquids. If the Access Parties intended KNGG to be a mere custodian with only possessory rights, why did they fail to specify this intent in the Access Agreement?

Furthermore, although the term "belong to" may mean something other than ownership when used in the Operating Agreement, the term arguably is used in a different context in the Access Agreement. *See Furmanite Am.*, 282 S.W.3d at 670 (recognizing terms are generally given a consistent meaning throughout a contract *unless* context indicates otherwise). First, courts and contracting parties sometimes use the somewhat colloquial term "belong to" to mean "ownership" or "title." *See, e.g.*, *Tenneco Oil Co.*, 416 S.W.2d at 389; *Investors Synd. Credit Corp.*, 420 S.W.2d at 445–46; *Wells*, 207 S.W.2d at 699–700. Other sources also indicate that the phrase "belong to" is commonly understood to refer to ownership of property. *See* Black's Law Dictionary (9th ed. 2009) ("belong" means, *inter alia*, "To be the property of a person or thing <this book belongs to

the judge>.  See OWNERSHIP"); Webster's Ninth New Collegiate Dictionary 143 (9th ed. 1991) ("belong" means, *inter alia,* "to be the property of a person or thing — used with *to*").

Second, the Access Parties apparently associate the Liquids "belonging to" KNGG with KNGG's ability to "*dispose of*" the Liquids away from the Transmission System. Two possible definitions of "dispose of" as used in this context are "[1] to transfer to the control of another <*disposing of* personal property to a total stranger>[, or 2] to get rid of <waste that is hard to *dispose of*>."  Webster's Ninth New Collegiate Dictionary 365. Under these definitions, KNGG would have the right to transfer control or "get rid" of the Liquids—a right that is unrestricted under the Access Agreement.  Moreover, in the Operating Agreement, KNPI was expressly afforded the "the right to use, market or dispose of the [downstream Liquids] and to retain all revenues," but the "right to sell" was not specifically referenced.   Nevertheless, such right could reasonably be denominated as included within KNPI's right to "dispose of" the downstream Liquids.  *See Harrell v. Hickman*, 147 Tex. 396, 401–02, 215 S.W.2d 876, 879 (1949) (recognizing that the "unrestricted right to dispose of" land is broad and includes the "right to sell" and right to transfer as a gift).   Therefore, it is reasonable to interpret the term "dispose of" as used in the Agreements to relate to an ownership right.

Third, in section 1.1 of the Access Agreement, the Access Parties defined Northern's Facilities and *expressly* recognized that Northern would retain title to and ownership of the Facilities.  It is reasonable to assume the Access Parties would have included a similar provision had they intended for Northern to retain title to and ownership of the downstream Liquids.  *See Williams*, 353 S.W.3d at 145 (explaining doctrine of *inclusio unius*).

Fourth, in section 1.10 of the Access Agreement, Northern agreed not to dispose of waste into tanks used to hold *KNGG's Liquids*:

13

1.10 Automatic Dumps.   Northern shall be responsible for maintaining and operating all automatic dumps and drips at the Facilities.   Northern will not dispose of water, used engine oils, or other undesirable substances by dumping them into tanks or vessels used to receive or store KNGG's liquids.

This provision reasonably may be interpreted to mean Northern agreed that it will not place waste in the tanks because doing so would contaminate Liquids *owned by* KNGG.   For the aforementioned reasons, it is reasonable to interpret the term "belong to" as used in the Access Agreement differently than the term is used in the Operating Agreement.

Additionally, the duration provisions of the Operating and Access Agreements cast doubt on an interpretation that the Contracting Parties intended KNGG would be a mere custodian of the downstream Liquids.   The Operating Agreement includes the following duration provision:

> The term of this Agreement shall be for a period of eighteen (18) years commencing as of [April 1, 1997]; provided however, in the event the Bushton Complex does not process gas for a period of twelve (12) consecutive months, then Northern, at its sole election, may terminate this Agreement to be effective upon thirty (30) days prior written notice.

Similarly, the Access Agreement contains a separate duration provision:

> This Agreement shall be effective from the date hereof [March 31, 1997], however, the Effective Date of this Agreement shall be the Effective Time of Closing as defined in [the purchase-and-sale agreement between KNGG and an Enron entity].   Subject to the terms hereof, commencing with the Effective Date of this Agreement, this Agreement shall have an initial term of eighteen years ("Initial Term").   Upon expiration of the Initial Term, this Agreement shall automatically renew from year to year thereafter, unless terminated by either Party by giving written notice of termination to the other Party at least ninety (90) days prior to the end of the Initial Term or any anniversary.

Although both Agreements have a term of eighteen years, the Operating Agreement does not automatically renew at the end of the term and may be terminated by Northern when (as alleged in this case) gas is not processed at the Bushton Complex for twelve consecutive months.   Nevertheless, the Access Agreement automatically continues year-to-year

14

following the initial term and may not be terminated early by Northern or KNGG except for a material breach.[11]   Accordingly, the Contracting Parties anticipated future events that would render the Operating Agreement terminated, but would not affect KNGG's obligation to collect and dispose of Liquids from Northern's Facilities pursuant to the Access Agreement.   In such a situation, if KNGG does not own the Liquids, KNGG is without direction regarding what to do with them.   Should KNGG store the Liquids until further notice from Northern?   If so, who bears the costs for such storage and any related environmental expenses?   These considerations would require additional agreements between Northern and KNGG.   However, a merger clause in the Access Agreement expressly negates the need for additional agreements.[12]   *Ikon Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 125 n.6 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("A 'merger clause' is a provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document." (citation omitted)).   This factor weighs against a conclusion that the Contracting Parties intended KNGG to be a mere possessory custodian of downstream Liquids.

We also reject Northern's argument that KNGG must have intended KNPI to be the sole owner of the downstream Liquids because KNGG was a party to both Agreements and would not have agreed to section 3.7 had KNGG intended to obtain ownership of such Liquids.   We cannot dismiss the reasonable possibility that, through the Operating Agreement, KNGG was "disposing of" its interests in the downstream Liquids to KNPI. In the Access Agreement, KNGG agrees to collect and dispose of the Liquids *and* generally accept responsibility for any adverse environmental consequences which may

---

[11] The duration provision of the Access Agreement contains a paragraph governing termination in the instance of material breach.

[12] Specifically, the Access Agreement includes the following merger clause: "This Agreement constitutes the entire agreement concerning the subject matter between the parties hereto and shall be amended only by an instrument in writing executed by both parties hereto."

occur at the Facilities where Liquids are transferred to KNGG. In the Operating Agreement, KNPI agrees to be responsible for "picking-up, hauling or paying any costs for," the accounting of, and "the liability and costs associated with the disposal of" Downstream Liquids. Construed together, these provisions reasonably may be interpreted to mean that KNGG transferred ownership of the downstream Liquids to KNPI in exchange for KNPI's assumption of all responsibilities and costs for such Liquids. We recognize that, in the same provision of the Operating Agreement, KNPI also appears to provide consideration to Northern for the downstream Liquids, i.e., $640,000 for Northern's "related capital and O&M costs" and for shrinkage attributable to downstream Liquids; in the Access Agreement, KNGG did not agree to give such specific consideration for the Liquids. However, this does not necessarily mean the Contracting Parties did not intend KNGG would have an ownership interest in the Downstream Liquids. Northern, KNPI, and KNGG were parties to the Operating Agreement and capable of negotiating a transfer of the Downstream Liquids that mutually benefitted all parties.

Finally, Northern contends that, assuming there is an ambiguity regarding ownership of the Liquids, such ambiguity exists because section 3.7 of the Operating Agreement is inconsistent with sections 1.2(a) and 2.6 of the Access Agreement. Northern argues section 3.7, as the later-in-time provision, supersedes sections 1.2(a) and 2.6. When a contract pertains to the same subject matter as an earlier contract made by the same parties but does not specify whether or to what extent the later contract is intended to operate in discharge or substitution of the earlier contract, the later contract prevails to the extent the contracts are inconsistent. *The Courage Co., L.L.C. v. The Chemshare Corp.*, 93 S.W.3d 323, 333 (Tex. App.—Houston [14th Dist.] 2002, no pet.). The portion of the earlier contract not in conflict with the later conflict remains enforceable. *Id.* We reject Northern's reliance on the later-in-time-prevails doctrine because, as explained above, it is reasonable to conclude that, through the Operating Agreement, KNGG was

16

"disposing of" its interests in the downstream Liquids to KNPI. Under such an interpretation, the Agreements are not irreconcilably inconsistent.[13]

In sum, construing the Agreements together, we cannot conclusively determine what type or degree of interest regarding the downstream Liquids Northern intended to convey to KNGG. The Agreements present an ambiguity relative to this issue. *See White Oak Operating*, 362 S.W.3d at 733 ("A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation."); *see also DeClaris Assocs. v. McCoy Workplace Solutions, L.P.*, 331 S.W.3d 556, 562 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("An ambiguity in a contract may be said to be patent or latent. Patent ambiguity in a contract is ambiguity that is apparent on the face of the contract; latent ambiguity is ambiguity that only becomes apparent when a facially unambiguous contract is applied under particular circumstances.").[14] Thus, we agree with Northern that the trial court erred by granting the ONEOK Entities' motion for summary judgment. However, we reject Northern's contention that the trial court should have

---

[13] Additionally, we are unable to determine from this record whether the Operating Agreement actually is the later-in-time agreement. Both Agreements were entered into on March 31, 1997, but it is not determinable from the record which Agreement precedes the other. For example, the Operating Parties could have entered into the Operating Agreement during the morning of March 31, to be effective April 1. If so, Northern could have conveyed ownership of the Liquids to KNGG at any time before April 1 because the Operating Agreement was not yet effective. *See Franco v. Lopez*, 307 S.W.3d 551, 554 (Tex. App.—Dallas 2010, no pet.) ("[A]ppellees' failure to perform these obligations . . . before the contract became effective . . . did not constitute a breach or prevent them from enforcing the contract."); *John Paul Mitchell Sys. v. Randalls Food Markets, Inc.*, 17 S.W.3d 721, 729 (Tex. App.—Austin 2000, pet. denied) (involving dispute which was resolved by November 1997 settlement agreement, effective December 1997; "If [defendant engaged in conduct violative of the settlement] *before* the effective date of the settlement, that would not establish a breach of the settlement agreement. The conduct would have to occur *after* [December 1997] to constitute a breach.").

[14] The ONEOK Entities attached to their motion for summary judgment letters from Northern to OFS in which Northern apparently described OFS as the owner of the Liquids pursuant to the Access Agreement. However, the ONEOK Entities also attached a letter in which Northern asserted the Liquids belong to OFS pursuant to section 3.7 of the Operating Agreement. Construed together, these letters further demonstrate that a fact issue exists regarding ownership of the downstream Liquids. On remand, the parties are free to present evidence regarding the Contracting Parties' intentions. *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008) ("Only where a contract is ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument." (citation omitted)).

17

rendered judgment in Northern's favor and adopted Northern's proffered contract interpretation. *See Hewlett-Packard Co. v. Benchmark Elecs., Inc.*, 142 S.W.3d 554, 561 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) ("When a contract contains an ambiguity, granting a motion for summary judgment is improper because interpretation of the instrument becomes a fact issue."). Northern's first through sixth issues are sustained in part and overruled in part.

We reverse the trial court's judgment and remand for further proceedings consistent with this opinion.


/s/     Charles W. Seymore
        Justice



Panel consists of Justices Seymore, Boyce, and Yates.[15]

---

[15] Senior Justice Leslie Brock Yates sitting by assignment.