**Opinion issued April 13, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-20-00055-CV**

———————————

**AMERICAN MIDSTREAM (ALABAMA INTRASTATE), LLC,**
**Appellant/Counter-Appellee**

**V.**

**RAINBOW ENERGY MARKETING CORPORATION, Appellee/Counter-Appellant**

---

**On Appeal from the 157th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-24591**

---

**DISSENTING OPINION**

Texas courts are not authorized to rewrite agreements to insert provisions that the parties could have included or to imply limitations for which the parties have not bargained. *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d

682, 690 (Tex. 2022). I conclude that the trial court misconstrued a key provision of the parties' unambiguous MAG-0005 agreement by inserting limiting qualifiers that changed the terms of the parties' bargain.

The MAG-0005 section 9.1 exempted AMID from performing balancing services on any day upon which Transco requested or required Rainbow to "balance receipts and deliveries of gas attributable to" Rainbow. The trial court misconstrued this provision of section 9.1 as exempting AMID's performance where "use of the MAG-0005 would create an imbalance between Rainbow's *scheduled* receipts and *scheduled* deliveries"—a scenario that, by Rainbow's own admission, never occurs. (Emphasis added.)

By contrast, it is undisputed that Rainbow's use of the MAG-0005 always creates an imbalance between its receipts and physical deliveries. Under the plain language of the contract, section 9.1 exempts AMID from performing balancing services for Rainbow on days that Transco requested or required Rainbow to "balance receipts and deliveries of gas attributable to" Rainbow. By writing in the limiting word "scheduled" before "deliveries," the trial court radically altered the meaning of section 9.1, thereby requiring AMID to perform balancing services even on days that Transco requested or required Rainbow to balance its scheduled receipts and physical deliveries. Because this misconstruction was instrumental to the trial

2

court's resolution of the claims in the case, I respectfully dissent. I would reverse and render judgment for AMID in part and remand for a new trial in part.

## I. Interpretation of the MAG-0005 Contract

It is well settled that Texas courts may "not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996). Rather, courts are obligated to "ascertain the true intentions of the parties as expressed in the writing itself," starting with the contract's express language. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).

When a contract is worded such that it "can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous and [the court] will construe it as a matter of law." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019) (citation omitted). In construing an unambiguous contract, the court may consider the "facts and circumstances surrounding its execution to aid our interpretation." *Nettye Engler Energy*, 639 S.W.3d at 690. This inquiry is not unbounded, however. The court may not use outside evidence, such as expert testimony or industry custom, to "add, alter, or change the contract's agreed-to terms." *Id.* (quoting *Barrow-Shaver*, 590 S.W.3d at 485).

3

## A. The Trial Court's Interpretation of the MAG-0005

The trial court failed to heed these limitations when it interpreted section 9.1 of the MAG-0005. The MAG-0005 authorized Rainbow to transport up to 20,000 MMBtu of gas per day on the Magnolia pipeline. But this authorization was not absolute. Both parties acknowledge that the MAG-0005 required AMID to provide a firm balancing service to Rainbow unless contractually specified conditions excused AMID from performing. Those conditions are specified in section 9.1, which states as follows:

> Receipts and Deliveries of Gas. Except as otherwise provided for herein, for the purposes of Section 8 of the SOC [statement of terms and conditions], Shipper [Rainbow] shall not be obligated to balance receipts and deliveries of gas on a daily basis unless, on or for any Day, either Transporter [AMID] or Shipper is requested or required by an upstream or downstream party to **balance receipts and deliveries of gas attributable to Shipper.** If Transporter is requested or required by an upstream or downstream party to balance receipts or deliveries of gas that are attributable to Shipper, Transporter may cease receiving gas from or delivering gas to or for Shipper until the upstream or downstream party no longer requests or requires Transporter to balance receipts and deliveries of Shipper's gas.

(Emphasis in bold added.)

In the trial court's Additional Amended Findings of Fact and Conclusions of Law, the trial court inserted new terms into section 9.1 that distinguished between physical imbalances and scheduling imbalances:

> It is unambiguous under Section 9.1 of the MAG-0005 that AMID was excused from providing firm balancing service to Rainbow if and only if Transco either (a) requested or required AMID to balance **scheduled**

4

**quantities** with **physical deliveries** of gas at the Magnolia-Transco Interconnect where Rainbow's use of the MAG-0005 created an imbalance between **scheduled quantities** and **physical deliveries** at that point; or (b) requested or required Rainbow or AMID to balance Rainbow's receipts and deliveries on Transco where use of the MAG-0005 would create an imbalance between Rainbow's **scheduled receipts** and **scheduled deliveries** on Transco.

(Emphasis added.)

AMID argues that the trial court's interpretation of section 9.1 differs significantly from the terms that the parties actually chose for their contract. I agree.

Sentence one in section 9.1 exempted AMID from performing balancing services for Rainbow whenever Transco requested or required Rainbow to "balance receipts and deliveries of gas attributable to" Rainbow. The parties chose not to place any limitation on the term "receipts" or "deliveries." As such, the unambiguous MAG-0005 exempted AMID from performing balancing services whenever Transco requested or required Rainbow to balance its receipts and deliveries of any sort, regardless of whether the imbalance was a scheduling imbalance (between scheduled receipts and scheduled deliveries) or a physical imbalance (between scheduled receipts and physical deliveries).

The trial court erred by inserting the word "scheduled" before deliveries in construing section 9.1 sentence one. "Courts are not authorized to rewrite agreements to insert provisions parties could have included or to imply terms for which they have not bargained." *Best v. Falcon Rock Cmty. Ass'n, Inc.*, No. 14-17-

5

00052-CV, 2018 WL 4139092, at *2 (Tex. App.—Houston [14th Dist.] Aug. 30, 2018, no pet.) (mem. op.). If Rainbow had wanted to limit the term "deliveries" to scheduled deliveries only, then it was incumbent upon Rainbow to bargain for and obtain such a limitation in the text of the contract. *See Barrow-Shaver*, 590 S.W.3d at 493 (cautioning that courts will not "disturb the risk allocation to which the parties agreed"). It is undisputed that Rainbow's usage of the MAG-0005 to pull and park gas always creates an imbalance between Rainbow's scheduled receipts and physical deliveries. Under section 9.1 as written, AMID is exempt from performing balancing services on days when Transco issues an Operational Flow Order ("OFO") that requires Rainbow to balance its scheduled receipts and physical deliveries.

By placing the limiting word "scheduled" before "deliveries," the trial court rewrote the contract to require AMID to perform such balancing service even on days when Transco issues such an OFO that applies to Rainbow. The court interpreted sentence one in section 9.1 to exempt AMID from performing balancing services for Rainbow on any day that Transco requested or required Rainbow to balance its scheduled receipts and *scheduled* deliveries, but not when Transco requested or required Rainbow to balance its receipts and physical deliveries. It is undisputed that Rainbow never has an imbalance between its scheduled receipts and scheduled deliveries. That is because, under the Operational Balancing Agreement ("OBA") between AMID and Transco and Transco's Federal Energy Regulatory

6

Commission ("FERC") tariff, the gas nominated by Rainbow and confirmed by AMID would be "deemed" received by Transco, regardless of how much physical gas flowed through the Magnolia-Transco Interconnect on a given day. By interpreting the MAG-0005 in this manner, the trial court limited AMID's sentence-one exemption to a scenario that does not occur.

The trial court's addition of the word "scheduled" before "deliveries" in section 9.1 sentence one also creates another problem: inconsistency with the court's addition of the word "physical" before "deliveries" in interpreting section 9.1 sentence two. Texas courts recognize the general presumption that identical words used in different parts of a contract should generally be given the same meaning. *Farmers Grp., Inc. v. Geter*, 620 S.W.3d 702, 709 (Tex. 2021); *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex. 1990) ("Words used in one sense in one part of a contract are, as a general rule, deemed to have been used in the same sense in another part of the instrument, where there is nothing in the context to indicate otherwise."); *accord Solvent Underwriters Subscribing to Energy Ins. Int'l, Inc. Cover Note No. EII–3824 v. Furmanite Am., Inc.*, 282 S.W.3d 661, 669–70 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

By giving the word "deliveries" different meanings just one sentence apart, the trial court rewrote the terms of the parties' agreement. As rewritten, the trial court exempted AMID from performing balancing services when Transco requested or

7

required AMID to balance scheduled quantities with physical deliveries of gas (applying sentence two), but not when Transco requested or required Rainbow to balance Rainbow's receipts with physical deliveries of gas (applying sentence one).

Nothing in the context of the MAG-0005 supports this distinction. Rather, the Statement of Operating Expenses, which is incorporated by reference into the MAG-0005, refers specifically to physical imbalances. When parties incorporate a document into their contract by reference, both instruments must be read and construed together. *In re C & H News Co.*, 133 S.W.3d 642, 645–46 (Tex. App.—Corpus Christi–Edinburg 2003, orig. proceeding); *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex.2010) (orig. proceeding) (per curiam). The trial court therefore erred as a matter of law by interpreting section 9.1 sentence one to refer only to an imbalance between receipts and scheduled deliveries and not to an imbalance between receipts and physical deliveries.

Rainbow justifies this strained construction based on the difference between the phrase "receipts and deliveries" in sentence one and "receipts or deliveries" in sentence two. Rainbow argues that it was necessary to define "deliveries" in two different ways to give effect to the parties' use of "and" in one sentence and "or" in another. I disagree.

Both sentences in section 9.1 make sense when the term "deliveries" is interpreted as encompassing physical deliveries. Sentence one is triggered if Transco

8

requested or required AMID or Rainbow to balance "receipts and deliveries" of gas. As Rainbow acknowledges, this phrase refers to a "point to point imbalance," meaning an imbalance between receipts on a pipeline and deliveries at a downstream point. The ability to be out of balance made the MAG-0005 valuable to Rainbow. When prices rose on cold days, Rainbow could use the MAG-0005 to physically receive gas from Transco's pipeline to sell to downstream customers. When the weather warmed up and prices dropped, Rainbow could purchase gas to deliver back into the pipeline, enabling Rainbow to buy low and sell high. Section 9.1 sentence one, however, suspended Rainbow's right to be out of balance for the day if Transco issued an OFO that requested or required Rainbow to balance receipts and deliveries of gas attributable to Rainbow.

By contrast, sentence two of section 9.1 applied if Transco requested or required AMID to "balance receipts or deliveries" of gas attributable to Rainbow. Both parties acknowledge that this applies to a "single point imbalance" at the Magnolia-Transco Interconnect. This sentence reflects the other way that Transco manages imbalances: by communicating directly with AMID as opposed to issuing an OFO that applies to a shipper. Transco can issue OFOs to interconnected pipelines, known as "OBA parties," requiring them to limit imbalances at an interconnect point. The court was not required to interpret the term "deliveries" in sentence one as excluding physical imbalances to give sentence two meaning.

9

## B.     Evidence of Surrounding Circumstances

In its Additional Amended Findings of Fact and Conclusions of Law, the trial court gave the following justification for its interpretation of section 9.1:

> In construing Section 9.1, the Court considered the entirety of the MAG-0005 Agreement and objective evidence of the surrounding facts and circumstances (including the OBA and Transco's FERC tariff) as an aid in the construction of the MAG-0005, and determined that this was the only reasonable interpretation of Section 9.1. The Court considered evidence of industry custom and usage, which was supportive of the unambiguous meaning of the MAG-00[0]5, but did not add to, delete from, or change the plain text of the MAG-0005 based on such evidence. Even if the MAG-0005 was ambiguous, then the Court, as finder of fact, determines that Section 9.1 should be interpreted in the same manner, based on all evidence presented at trial, including the admissions of AMID's corporate representative regarding the communications from Transco in evidence.

On appeal, Rainbow defends the trial court's interpretation of section 9.1 as follows: Transco's tariff defines "receipts" and "deliveries" based on the terms of an OBA if there is one in effect for the applicable interconnects. Under the OBA applicable to the relevant interconnect, Rainbow's nominated gas is "deemed" received by Transco. Rainbow argues that these documents are consistent with Rainbow's Pooling Agreement with Transco, which always requires Rainbow to nominate equal quantities of scheduled receipts and scheduled deliveries, thereby ensuring that there is never an imbalance between Rainbow's scheduled receipts and scheduled deliveries so long as the OBA is in effect. Therefore, Rainbow argues,

10

section 9.1 sentence one should be interpreted to refer only to "scheduled" deliveries as opposed to "physical deliveries."

Rainbow's argument and the trial court's interpretation contravene fundamental principles of Texas contract construction. It is well settled that evidence of circumstances can be used to "inform the contract text and render it capable of only one meaning," but "extrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity." *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (citations omitted). Proof of "surrounding facts and circumstances, including evidence of industry custom and usage, cannot be used to add, alter, or change the contract's agreed-to terms." *Barrow-Shaver*, 590 S.W.3d at 485. Courts cannot use it to "make the language say what it unambiguously does not say or to show that the parties probably meant, or could have meant, something other than what their agreement stated." *Id.* at 483 (citation and internal quotation marks omitted). Consequently, the trial court could not invoke the OBA, the FERC tariff, or industry custom and usage "to create an ambiguity where none exists, or to alter the terms of the contract's clear and unequivocal language as to the parties' obligations."[1] *Id.* at 486.

---

[1] On appeal, Rainbow relies on the FERC tariff and the OBA as "surrounding circumstances" to support its interpretation. Rainbow does not point to any evidence of industry custom or usage that would preclude the word "deliveries" in sentence one from encompassing physical deliveries. Rainbow would have been required to prove that this usage was "so regularly observed in place, vocation, trade, or

11

The Texas Supreme Court has a long history of refusing parties' efforts to graft limitations onto contractual language that the parties did not choose for themselves. *Id.* at 484; *Murphy Expl. & Prod. Co.–USA v. Adams*, 560 S.W.3d 105, 111–13 (Tex. 2018) (holding that "leases' express language includes no proximity requirement for the offset well," and refusing to "imply such a restriction" into the leases); *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 769 (Tex. 2018) (holding that "the court of appeals went too far in looking beyond the Settlement Agreement's language to interlineate limitations and specific results not expressed in the instrument itself"); *Tenneco,* 925 S.W.2d at 646 (recognizing that courts have long refused to imply restraints that are absent from the agreement).

This case is similar to *Barrow-Shaver Resources Co. v. Carrizo Oil & Gas, Inc.* In *Barrow-Shaver*, a lawsuit arose from a farmout agreement between the two parties, pursuant to which Barrow-Shaver would earn a partial assignment of Carrizo's interest in a 22,000-acre lease upon the completion of a successful well. 590 S.W.3d at 475. The agreement contained the following provision regarding assignments:

---

industry so 'as to justify an expectation that it will be observed with respect to a particular agreement.'" *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 n.6 (Tex. 1995) (per curiam) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 222(1)). There is no such proof. The trial court's interpretation of section 9.1 sentence two confirms that the term "deliveries" can refer to physical deliveries.

> The rights provided to [Barrow-Shaver] under this Letter Agreement may not be assigned, subleased, or otherwise transferred in whole or in part, without the express written consent of Carrizo.

*Id.* at 476. Barrow-Shaver ultimately proposed to assign the farmout agreement to a third-party entity, but Carrizo refused to consent, and the proposal fell through. *Id.*

Barrow-Shaver then sued Carrizo for claims including breach of contract and fraud based upon Carrizo's failure to consent to the proposal. *Id.* at 476–77. Barrow-Shaver argued that the consent-to-assign provision was unambiguous but silent as to the basis on which Carrizo could withhold its consent, thereby necessitating consideration of the surrounding circumstances to determine the provision's limitations. *Id.* at 477. According to Barrow-Shaver, the surrounding circumstances included an examination of industry custom and usage that evidenced a reasonableness limitation on Carrizo's right to withhold consent. *Id.* Carrizo responded that, far from being silent, the provision unambiguously imposed a hard consent obligation on Barrow-Shaver such that Carrizo could withhold its consent for any reason. *Id.*

The Texas Supreme Court rejected Barrow-Shaver's argument and held that the contract unambiguously allowed Carrizo to refuse its consent "for any reason." *Id.* at 495. The court concluded that "by not addressing the circumstances under which Carrizo could withhold consent, the agreement speaks to the parties' agreement—an unqualified right to withhold consent." *Id.* at 494. The court declined

13

to allow extrinsic evidence to "import an obligation that does not exist in the contract—evidence introduced for the sole purpose of inviting the jury to qualify Carrizo's right to withhold consent when Carrizo bears no consent obligation under the farmout agreement." *Id.* at 486–87. The court reasoned that if it were to allow such evidence, the court would "vitiate the parties' express agreement that Barrow-Shaver cannot assign its rights without Carrizo's consent," and it would "rewrite the parties' agreement to say that Barrow-Shaver is entitled to assign its rights, or reap the benefit of a proposed assignment, even without Carrizo's consent." *Id.* at 487.

As in *Barrow-Shaver*, the contract term in question here is unqualified and unambiguous. Section 9.1 exempts AMID from performing balancing services whenever Transco requests or requires Rainbow to balance receipts and deliveries of gas attributable to Rainbow of whatever sort. The trial court therefore could not invoke the FERC tariff, the OBA, or witness testimony to limit the term "deliveries" in sentence one to "scheduled deliveries" of gas, to the exclusion of physical deliveries of gas.[2] Courts have no authority to "change the terms of the parties' unambiguous agreement." *Id.* We may neither rewrite the parties' contract nor add to its language. *Nettye Engler Energy*, 639 S.W.3d at 695.

---

[2] Regardless, nothing in the FERC tariff or the OBA supported the trial court's interpretation of the term "deliveries" to mean two different things in section 9.1.

14

### C.    The OBA as Context for the MAG-0005

The trial court was not precluded from considering "surrounding circumstances," however. Rather, the trial court was authorized to consider such proof to "inform the meaning of the language the parties chose," so long as the trial court did not add to or alter an unrestricted term. *URI*, 543 S.W.3d at 763.

The OBA between AMID and Transco provides useful context for interpreting the term that the parties actually used in the MAG-0005 section 9.1— the unrestricted term "deliveries." The OBA between AMID and Transco contemplates that AMID generally will have daily imbalances between the amount of gas that it schedules to flow across the interconnect on a given day and the amount of gas that physically flows across the interconnect. Section 2 specifies that any gas which AMID schedules on behalf of a shipper is "deemed to have been received" by Transco on that day, no matter whether it is physically delivered on that day. Under OBA section 7, AMID and Transco resolve the cumulative imbalances at the end of each month pursuant to the OBA's accounting procedures.

At trial, AMID presented evidence that significant imbalances between receipts and physical deliveries on pipelines can create a pipeline rupture or a depressurization event. The OBA contains a mechanism that addresses these concerns. Specifically, the OBA defines the "Operational Imbalance" as the imbalance created "when the actual physical flow is different than the Scheduled

Quantities." Section 16(b) of the OBA authorized Transco to limit Operational Imbalances at the Magnolia-Transco Interconnect if (1) the "Operational Imbalance exceeds 5% of confirmed nominations at any Location[,]" including the Magnolia-Transco Interconnect; and (2) "such daily Operational Imbalance creates operational concerns in either Party's sole discretion." Five percent of total nominations at the Magnolia-Transco Interconnect is approximately 6,000 MMBtu.

When the term "deliveries" in the MAG-0005 section 9.1 is construed without limitation as encompassing physical deliveries, section 9.1 complements the OBA's mechanism for addressing operational concerns created by imbalances. Given the possibility that Transco's actions could limit Rainbow's ability to use all or part of Transco's 22,000 MMBtu out-of-balance capacity, section 9.1 required Rainbow to balance its receipts and deliveries of gas attributable to Rainbow on any day that Transco requested or required either AMID or Rainbow to do so. In other words, the OBA and the MAG-0005 limit imbalances in corresponding circumstances.

## II.    Contract Claims and Counterclaim

Because the trial court's misconstruction of section 9.1 was key to the court's resolution of Rainbow's breach of contract claim, I would reverse the judgment for Rainbow on that claim and remand for a new trial. Because there is no proof that AMID repudiated the MAG-0005 when that document is properly interpreted, I would reverse and render judgment for AMID on Rainbow's claim for damages

allegedly resulting from that repudiation. I would also reverse and remand for a new trial on AMID's breach of contract counterclaim.

## A.    Rainbow's Breach of Contract Claim

As a matter of law, under section 9.1, AMID did not breach the MAG-0005 by denying balancing services to Rainbow on any day upon which Transco had issued a written OFO or critical alert requesting or requiring Rainbow to balance receipts and deliveries of gas (including physical deliveries) attributable to Rainbow. The trial court made no findings about whether any of the OFOs in evidence that were issued by Transco applied to Rainbow. That is because, under the court's misconstruction of section 9.1, Transco's request or requirement that Rainbow balance its receipts and deliveries of gas (including physical deliveries) could never authorize AMID to deny balancing services. Because section 9.1 unambiguously excuses AMID from performing balancing services on dates that Transco issues such an OFO that applies to Rainbow, a new trial is necessary.

The evidence at trial created a fact issue that required the trial court to determine whether Transco had issued an OFO applicable to Rainbow on the dates upon which the court found AMID to be in breach for denying balancing services to Rainbow. It is undisputed that Transco had issued a written OFO or critical alert on all but one of the specific days upon which the court found that AMID had breached

the MAG-0005.[3] Rainbow acknowledges that Transco's OFOs direct shippers to "limit imbalances between receipts and deliveries on the pipeline, under threat of penalties." The parties' disagreement is whether the OFOs issued on the relevant dates applied to Rainbow.

Rainbow argued that these OFOs did not apply to it because the box for affected shipper on each OFO was left blank. By contrast, AMID presented evidence that the OFOs did apply to Rainbow. All the OFOs in evidence expressly apply to imbalances in Zone 4, where the Magnolia-Transco Interconnect is located. Rainbow's President, Stacy Tschider, testified with respect to OFO applicability as follows:

> Q. And my question, Mr. Tschider, is, if you are physically out of balance—meaning at the beginning of the pipe, when you're going into it versus the exit of the pipe, when you're going out of it—those don't line up in terms of physical quantities of actual natural gas, physical monitors.
>
> A. Correct.
>
> Q. So if you are in that situation—
>
> A. Right.
>
> Q. —hypothetically—
>
> A. Okay.
>
> Q. —you would agree that this OFO, Exhibit 8, would apply to Rainbow as the shipper?

---

[3] The trial court found that AMID breached the MAG-0005 on the following dates in 2016: January 11, January 23, January 24, February 11, November 22, December 6, and December 15. It is undisputed that Transco had issued an OFO or critical alert requiring daily balancing on each day except November 22.

18

A. Yes. If it was in those areas—if it was in Zone 4, Zone 5, or Zone 6. Yes.

This testimony raises a fact issue on whether the OFOs in evidence applied to Rainbow. As such, I would remand to the trial court to determine whether an OFO applicable to Rainbow was in place on any day upon which an alleged breach occurred. As a matter of law, Rainbow is not entitled to a finding of breach or an award of damages based upon AMID's denial of balancing services to Rainbow on any day that an OFO or critical alert applicable to Rainbow was in place.

The court's error in misconstruing the contract also infects the damages award. The trial court justified its damages award on the following grounds: "Had AMID performed as promised in January 2016, it is reasonably certain Rainbow would have entered into forward sales contracts with its customers for February 2016 at a price of $4.069/MMBtu and for March 2016 at a price of $1.911/MMBtu (the NYMEX LDS for the month plus the average basis reported by the Intercontinental Exchange)." The court further found that "Rainbow suffered immediate damages" when AMID curtailed its February 11, 2016 nomination and Rainbow was required to purchase more expensive gas from other sources to satisfy its obligations to its customers. The court further found that AMID's "ongoing non-performance" caused Rainbow to determine that it "could not reliably enter into any forward sales

contracts for the 2016–2017 winter season using [the] MAG-0005 without incurring substantial risks," so it "used the MAG-0005 to support daily trades only."

The trial court further concluded that AMID's refusal to provide balancing service on those dates in 2016 "effectively made the firm balancing service interruptible, destroying the benefit of the bargain for Rainbow." According to the trial court, this material breach "proximately and foreseeably damaged Rainbow by making it impossible for Rainbow to reliably enter into forward sales with customers—under which Rainbow would have earned profits."

Here, it is undisputed that Transco had issued an OFO or critical alert in Zone 4 on each of the January, February, and December 2016 dates upon which the court found AMID to have breached the MAG-0005. The only question is whether those OFOs or critical alerts applied to Rainbow. Rainbow cannot recover any damages based on AMID's refusal to provide balancing services on a day that section 9.1 exempted AMID from doing so. Nor can Rainbow recover for its choice to use the MAG-0005 to support day trades only if that choice was triggered by AMID's exercise of contractual rights as specified in section 9.1. Consequently, I would reverse the judgment on Rainbow's breach of contract claim and remand for a new trial.

**B.      Repudiation and the December 7, 2016 Conference Call**

I would also reverse and render judgment for AMID on the trial court's finding that statements by AMID's Patricia De La Rosa during a December 7, 2016 conference call constituted a repudiation by AMID. This finding was based on the court's mistaken determination that Rainbow was entitled to a daily out-of-balance capacity of 20,000 MMBtu under the MAG-0005.

Rainbow did not possess an absolute right under the MAG-0005 to an out-of-balance capacity of 20,000 MMBtu. To the contrary, under section 9.1 sentence one, AMID had the right to deny balancing services on any day that Transco "requested or required" Rainbow to "balance receipts and deliveries of gas" attributable to Rainbow. As explained above, the word "deliveries" in section 9.1 encompasses physical deliveries, thereby exempting AMID from performing balancing services when Transco issued OFOs that applied either to Rainbow itself or to AMID with respect to Rainbow's imbalance.

This proper interpretation of the contract supplies crucial context for De La Rosa's statement that the MAG-0005 "is interruptible, subject to the approval or being under [the] radar with Transco." To constitute a repudiation, a party to a contract must have "absolutely and unconditionally refused to perform the contract without just excuse." *El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (op. on reh'g). "[A] mere

21

assertion that the party will be unable or will refuse to perform his contract is not sufficient. It must be a distinct and unequivocal absolute refusal to perform the promise[.]" *Davis v. Canyon Creek Estates Homeowners Ass'n*, 350 S.W.3d 301, 313 (Tex. App.—San Antonio 2011, pet. denied) (quoting *Kilgore v. Nw. Tex. Baptist Educ. Soc'y*, 37 S.W. 598, 600 (Tex. 1896)). Rainbow had the burden to prove that AMID repudiated the MAG-0005. *See El Paso Prod.*, 112 S.W.3d at 622.

When the MAG-0005 is properly interpreted, De La Rosa's comments reflect AMID's assertion of its rights under section 9.1 as opposed to a repudiation of the MAG-0005. Transco's revised approach to imbalances was the subject of the December 7, 2016 conference call in question. AMID presented evidence that, at the time of the call, Transco was taking a harder line on imbalances. In 2015, Transco issued 4 imbalance OFOs. In 2016, Transco issued twice as many.

Rainbow gas trader Tim Moreino began the December 7 call by noting that Transco had issued several imbalance warnings and OFOs in Zone 4. He acknowledged, "I know when we first got into our balancing agreement, that these OFO's were, historically, not called in Zone 4," which was the location of the Magnolia-Transco Interconnect. He said that "[s]o, now they've been calling them, and like I said, now in zone [s]pecific. I just kind of want to hear from you guys what you think that looks like going forward in the future on our flexibility on using this balancing agreement."

Ed Formell, an AMID scheduler, responded that "Transco switched hands around last year at this time and that's when we honestly, really started to see them look for at [sic] imbalances." De La Rosa, who supervised Formell, added that "we have been called out more so on our OBA and our imbalance and this has started, I would even think last winter, they started to call us out on it, which kind of threw us for a surprise there."

De La Rosa advised Rainbow: "[W]e might be able to swing that [20,000 MMBtu] on a day, but being able to swing that for consecutive days, that's not going to happen. Because [Transco will] call us out very quickly the next day or two and tell us to get on rate."[4]

Later in the call, De La Rosa stated that "[w]e just want to make sure that you guys understand that [the MAG-0005] is interruptible, subject to the approval or being under [the] radar with Transco." The trial court found this statement that the MAG-0005 was "interruptible" to be a repudiation of the MAG-0005.

But that was not the end of the call. The call ended with AMID's representative suggesting that the parties "huddle up" to resolve these issues. Rainbow's representative responded, "Yeah, that sounds great, I mean, we'll huddle up and try to figure it out here. Because we like the flexibility, we love it and it just

---

[4]     Trial testimony showed that to get "on rate" means that the physical flow of gas should match the scheduled flow of gas.

seems—the pipe is changing, like you said, and we just want to figure out, if 20 is not the sweet spot or not the number, we are open to talking around it."

Interpreting section 9.1 as the parties drafted it, there is no evidence that AMID "absolutely and *unconditionally* refused to perform the contract without just excuse" on the December 7 call. *See El Paso Prod.*, 112 S.W.3d at 621 (emphasis added). De La Rosa's statement that the MAG-0005 was "interruptible" was made expressly conditional on the very condition that the parties agreed to in section 9.1. Her comments specifically addressed Rainbow's question regarding the impact that Transco's restrictions could have on the MAG-0005 in light of AMID's rights under section 9.1. If the parties did not stay "under the radar with Transco" and Transco consequently issued an OFO (or otherwise requested or required the parties to stay in balance), Rainbow's use of the MAG-0005 to be out-of-balance would be interrupted under section 9.1.

Nor was De La Rosa's statement "absolute" in the context of the full conversation. *See Davis*, 350 S.W.3d at 313 (requiring "distinct and unequivocal absolute refusal to perform the promise") (quoting *Kilgore*, 37 S.W. at 600). The parties' agreement to "huddle up" for future discussions about how to preserve the MAG-0005 under Transco's increasingly watchful eye is not an unequivocal refusal

to perform the MAG-0005.[5] And far from treating the contract as repudiated, it is undisputed that Rainbow continued to transact using the MAG-0005 for more than a month. AMID confirmed 12 more nominations by Rainbow after the December 7 call, including 2 nominations for 20,000 MMBtu in balancing services. Accordingly, I would reverse the finding and render a take-nothing judgment for Rainbow on the issue of repudiation. *See Narvaez v. Wilshire Credit Corp.*, 757 F. Supp. 2d 621, 632 (N.D. Tex. 2010) (concluding that, under Texas law, bank's conflicting messages regarding status of loan "[fell] short of the positive and unconditional repudiation necessary to maintain a cause of action for anticipatory breach").

## C.      Rainbow's Damages After February 1, 2017

I also respectfully disagree with the majority's conclusion that AMID was not excused from performing after Rainbow terminated the MAG-0005 on February 1, 2017. Even if De La Rosa's comments on December 7 constituted a repudiation, the $2 million awarded by the trial court for damages sustained by Rainbow after the termination date are not recoverable as a matter of law.

After a party breaches or repudiates a contract, the non-breaching party must make an election of rights. The non-breaching party can choose to treat the contract either as terminated or as continuing. *Man Indus. (India), Ltd. v. Midcontinent*

---

[5]     Even if AMID was proposing amendment discussions, the invitation to discuss amending the contract is not a positive and unconditional repudiation of the existing contract.

25

*Express Pipeline, LLC*, 407 S.W.3d 342, 368 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (breach); *El Paso Prod.*, 112 S.W.3d at 621 (repudiation). These options are "mutually exclusive." *Chilton Ins. Co. v. Pate & Pate Enters., Inc*., 930 S.W.2d 877, 888 (Tex. App.—San Antonio 1996, writ denied). The non-breaching party cannot have it both ways.

Here, there is undisputed evidence that Rainbow elected to continue performance under the MAG-0005 after each alleged breach and repudiation by AMID. From the date of the alleged repudiation through January 13, 2017, Rainbow nominated gas 12 times; received approval for two additional 20,000 MMBtu nominations; continued to pay the monthly demand fee; and retained net revenues of more than $180,000 under the contract.

Despite this evidence, the trial court concluded that Rainbow could belatedly act on AMID's alleged December 7 repudiation "by providing notice of default on December 21, 2016, ceasing service after January 13, 2017[,] and terminating [the] MAG-0005 on February 1, 2017."

This result contravenes our precedent. It is well settled that "seeking to benefit from the contract after the breach operates as a conclusive choice depriving the non-breaching party of an excuse for his own non-performance." *Henry v. Masson*, 333 S.W.3d 825, 841 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (collecting cases); *see also Smithdale Ct., Inc. v. Kelly*, No. 01-92-00018-CV, 1993 WL 282922, at *3–

26

4 (Tex. App.—Houston [1st Dist.] July 29, 1993, no writ) (not designated for publication) (repudiation) (holding that seller could not later terminate contract after continuing to insist that buyer proceed with closing following buyer's alleged breach); *Levco Constr., Inc. v. Whole Foods Mkt. Rocky Mountain/Sw. L.P.*, 549 S.W.3d 618, 641, 643 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (concluding that project owner could not withhold two final payments under construction contract because owner made "conclusive choice" to continue performance after alleged breach). Consequently, Rainbow did not have the option to continue to demand AMID's performance for more than a month and then terminate the agreement on February 1.

The majority argues that these cases are distinguishable because they involved finite contracts as opposed to discrete transactions conducted on an on-going basis under the MAG-0005. I have found no precedent that exempts parties to contracts contemplating future discrete transactions from the rule that "[s]eeking to benefit from the contract after the breach operates as a conclusive choice . . . ." *See Henry*, 333 S.W.3d at 841.

Here, once Rainbow elected to continue to perform under the MAG-0005 by making a nomination after December 7, it was bound to comply with the contract and pay the monthly demand charges. It is undisputed that Rainbow did not pay these charges after February 1, so AMID was entitled to terminate its own

performance at that point. As such, even if De La Rosa's December 7 comment were a repudiation, I would render judgment for AMID on Rainbow's claim for contract damages after February 1, 2017.

### D. AMID's Counterclaim for Breach of Contract and Attorney's Fees

The trial court concluded that AMID's repudiation of the MAG-0005 excused Rainbow from continuing to perform under the contract and precluded AMID from recovering on its counterclaim for breach of contract following Rainbow's February 1, 2017 termination. Because I would find that De La Rosa's statements did not constitute a repudiation as a matter of law, I would reverse and remand AMID's counterclaim for breach of contract for trial along with AMID's claim for attorney's fees under Civil Practice and Remedies Code Chapter 38. *See Pointe W. Ctr., LLC v. It's Alive, Inc.,* 476 S.W.3d 141, 153 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (reversing and remanding Chapter 38 attorney's fees award when claim forming basis of award is reversed).

## III. Rainbow's Claims for Fraud, Fraudulent Inducement, and Negligent Misrepresentation

The trial court found AMID liable to Rainbow for fraud, fraudulent inducement, and negligent misrepresentation based upon the court's legally erroneous interpretation of the MAG-0005 section 9.1 and the OBA. Consequently, I would reach these issues and render judgment for AMID as a matter of law on each of these claims.

28

To prevail on its tort claims, Rainbow was required to prove by a preponderance of the evidence that AMID made a false representation upon which Rainbow had justifiably relied. *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653–54 (Tex. 2018) (negligent misrepresentation); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex. 1998) (fraud).

The trial court found AMID liable for fraud and fraudulent inducement based upon its conclusion that "AMID represented to Rainbow it had the ability to provide a firm balancing service up to an MDQ of 20,000 MMBtu, subject only to the express limitations set forth in the MAG-0005 and AMID's Statement of Operating Conditions." The court further found that AMID "made this representation to Rainbow as a positive assertion recklessly and without any knowledge of its truth and did not do any investigation as to whether AMID could satisfy this obligation to Rainbow using its OBA with Transco."

According to the trial court, "AMID recklessly entered into [the] MAG-00[0]5 without reviewing or considering its contractual limitations under its OBA with Transco." The court determined that "AMID could not satisfy its obligations to Rainbow using the OBA alone." "Because AMID did not intend to use any means other than its OBA with Transco and that OBA did not provide Rainbow with sufficient capacity to satisfy AMID's obligations to Rainbow under the MAG-

29

0005," the trial court concluded that "AMID entered into the MAG-0005 Agreement with reckless disregard of its ability to perform."

When the MAG-0005 section 9.1 is properly interpreted, there is no evidence of any falsity in AMID's representation that AMID "had the ability to provide a firm balancing service up to an MDQ of 20,000 MMBtu, subject only to the express limitations set forth in the MAG-0005 and AMID's Statement of Operating Conditions." One such "express limitation" was section 9.1 sentence one. That sentence excused AMID from performing balancing services on any date that Transco requested or required either AMID or Rainbow to balance receipts and physical deliveries of gas attributable to Rainbow. The trial court erred as a matter of law by interpreting section 9.1 to require AMID to perform balancing services even under these circumstances. Rainbow had no absolute right to 20,000 MMBtu per day in balancing services. Rainbow had a right to 20,000 MMBtu per day in balancing services only on days that the exemptions in section 9.1 sentences one and two were not triggered.

Nothing in the OBA precluded AMID from providing Rainbow with 20,000 MMBtu in balancing services subject to the "express limitations" in section 9.1. The OBA did not strictly limit AMID's imbalances to 6,000 MMBtu. The court erred to the extent that it impliedly inferred such a restriction.

On the contrary, under section 16(b) of the OBA, Transco could limit imbalances exceeding 5% of total nominations (approximately 6,000 MMBtu) at the interconnect only on days that it determined that imbalances created "operational concerns." When such operational concerns were not present, AMID was free to run much larger imbalances. Indeed, there was proof that for the three years leading up to execution of the MAG-0005, AMID maintained imbalances of up to 40,000 to 60,000 MMBtu per day at the Magnolia-Transco Interconnect under the OBA with Transco. Those figures double or triple the option for up 20,000 MMBtu of out-of-balance capacity under the MAG-0005.

The trial court's findings and conclusions failed to acknowledge that the OBA's limitation on imbalances during periods of "operational concern" is accommodated by section 9.1 of the MAG-0005. Section 9.1 states that Rainbow could not be out of balance if Transco "requested or required" either AMID or Rainbow "to balance receipts and deliveries of gas attributable to [Rainbow]." Reading the OBA and the MAG-0005 together, if Transco experienced operational concerns and limited imbalances under the OBA, then Rainbow had no right to be out of balance under the MAG-0005. Indeed, the limitations in section 9.1 of the MAG-0005 go much further than the limitations in the OBA. If—for any reason whatsoever—Transco "requested or required" AMID or Rainbow to balance receipts and deliveries of gas attributable to Rainbow, then Rainbow could not be out of

balance under the MAG-0005. As such, there was no falsity in AMID's representation.

The trial court found for Rainbow on its negligent misrepresentation claim based upon the court's conclusion that "AMID negligently misrepresented to Rainbow that it would provide a firm balancing service up to 20,000 MMBtu/day." It is not clear from the court's conclusions whether this is an interpretation of the MAG-0005's contractual language, or whether the court found a separate oral agreement. If it is an interpretation, then Rainbow's negligent misrepresentation claim fails for the same reasons that its fraud and fraudulent inducement claims fail.

By contrast, if the trial court found that Rainbow relied on an unconditional oral promise by AMID to provide Rainbow with up to 20,000 MMBtu of balancing services per day without limitation, Rainbow's claim fails for lack of justifiable reliance as a matter of law. Under Texas law, "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *DeClaire v. G & B McIntosh Fam. Ltd. P'ship*, 260 S.W.3d 34, 47 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)). Section 9.1 of the MAG-0005 unambiguously limits Rainbow's right to submit out-of-balance nominations on any day Transco "requested or required" either AMID or Rainbow

32

to balance receipts and deliveries of gas attributable to Rainbow. Consequently, Rainbow could not have justifiably relied on any unconditional oral promise by AMID to provide Rainbow with 20,000 MMBtu of balancing services without limitation. I respectfully dissent.

April L. Farris
Justice

Panel consists of Justices Kelly, Hightower, and Farris.

Justice Farris, dissenting.